E-FILED
Friday, 01 March, 2013  01:24:10 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| DARROW LAVERNE WYATT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   11-cv-1467 |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

# O R D E R  &  O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 7) and Defendant's Motion for Summary Affirmance (Doc. 9). Plaintiff seeks judicial review of a decision of the Commissioner of Social Security denying disability benefits to Plaintiff. (Doc. 1 at 3). For the reasons stated below, the ALJ's decision is affirmed. Thus, Plaintiff's Motion for Summary Judgment is denied and Defendant's Motion for Summary Affirmance is granted.

## PROCEDURAL HISTORY

On July 11, 2008, Plaintiff Darrow Wyatt applied for Supplemental Security Income and Disability Insurance Benefits under the Social Security Act ("Act"), alleging he became disabled on April 15, 2008, following two strokes and a "heartache." (R. at 115-131, 125). His application for benefits was denied initially and on reconsideration. (R. at 59-63, 69). A hearing was held on February 23, 2010, at Plaintiff's request. (R. at 76-77). Administrative Law Judge ("ALJ") Gerard J. Rickert determined that Plaintiff was not disabled and denied benefits in a written

decision dated September 20, 2010. (R. at 15-22). The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner of Social Security. (R. at 1-3). Plaintiff filed the present action on December 28, 2011, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (Doc. 1).

LEGAL STANDARDS

## I. Disability Standard

To be entitled to disability benefits under the Social Security Act, a claimant must prove he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). The Commissioner must make factual determinations in assessing the claimant's ability to engage in substantial gainful activity. *See* 42 U.S.C. § 405(b)(1). The Commissioner applies a five-step sequential analysis to determine whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920;[1] *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999). The claimant has the burden to prove disability through step four of the analysis, i.e., he must demonstrate an impairment that is of sufficient severity to preclude him from pursuing his past work. *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980).

In the first step, a threshold determination is made as to whether the claimant is presently involved in a substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not under such employment, the Commissioner

---

[1] Because Plaintiff applied for benefits under both title II and title XVI of the Act, two different parts of the Code of Federal Regulations apply. However, the relevant regulations are virtually identical. Therefore, the Court will cite only to the regulations for title II (20 C.F.R. §§ 404.1500–.1599), omitting the citation to those for title XVI (20 C.F.R. §§ 416.900–.999d) unless there is a notable difference.

of Social Security proceeds to the next step. *Id.* At the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has an impairment that significantly limits his physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. 20 C.F.R. § 404.1520(c). If the claimant's impairments, considered in combination, are not severe, he is not disabled and the inquiry ends. *Id.* At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; if the elements of one of the Listings are met or equaled, the claimant is eligible for benefits. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, Appendix 1.

If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps, after making a finding as to the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). At the fourth step, the claimant's RFC is evaluated to determine whether he can pursue his past work. 20 C.F.R. § 404.1520(a)(4)(iv). If he cannot, then, at step five, the Commissioner evaluates the claimant's ability to perform other work available in the economy, again using his RFC. 20 C.F.R. § 404.1520(a)(4)(v).

## II. Standard of Review

When a claimant seeks judicial review of an ALJ's decision to deny benefits, the Court must "determine whether it was supported by substantial evidence or is the result of an error of law." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The Court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part: "The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive." Substantial evidence is "'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Maggard*, 167 F.3d at 379 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

In a substantial evidence determination, the Court will review the entire administrative record, but it will "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). In particular, credibility determinations by the ALJ are not upset "so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). The Court must ensure that the ALJ "build[s] an accurate and logical bridge from the evidence to his conclusion," but he need not have addressed every piece of evidence. *Clifford*, 227 F.3d at 872. Where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## BACKGROUND

### I. Relevant Medical History[2]

Plaintiff alleges his disability began on April 15, 2008, initially as the result of past strokes and heart problems. (R. at 115-131, 125). In April 2008, Plaintiff

---

[2] As noted above, the Court will review the entire administrative record, but focuses its discussion and analysis on the issues and evidence raised by the parties. Local Rule 8.1(D) provides that "[t]he plaintiff must cite to the record by page number the factual evidence which supports the plaintiff's position," and the Court does not scour the record for additional evidence that might support a plaintiff's claims. Especially where a plaintiff is, as here, represented by counsel, the failure to cite particular pieces of evidence in the record must constitute a waiver of the plaintiff's reliance on that evidence.

suffered a heart attack. (*See* R. at 42).[3] Though Plaintiff returned to work with reduced hours thereafter, this coincides with the alleged onset date of disability. (*See* R. at 38, 42). On July 5, 2008, Plaintiff went to the emergency room because of chest pain. (R. at 207). Testing revealed "transient acute ST elevation."[4] (R. at 207). Further tests showed normal heart wall motion and an ejection fraction of sixty-five percent,[5] and his coronary angiogram was normal. (R. at 207, 210-11). These findings were consistent with a coronary artery spasm. (R. at 207). Plaintiff was also diagnosed with hypertension, more commonly known as high blood pressure, and hyperlipidemia.[6] (R. at 207). A chest x-ray during this hospital visit showed degenerative changes in the thoracic spine. (R. at 229). Plaintiff was treated and released with prescriptions for medication after being observed for twenty-four hours without complication. (R. at 207). He did not return to work after that. (R. at 39).[7]

---

[3] Surprisingly, there are no medical records from this hospital visit in the record.

[4] This refers to irregularities in heart activity observed on an electrocardiogram. *See Dorland's Medical Dictionary*, http://www.dorlands.com (last visited Feb. 25, 2013).

[5] The ejection fraction is "the proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole." Sixty-five percent is considered normal. *Dorland's Medical Dictionary*, http://www.dorlands.com (last visited Feb. 25, 2013).

[6] Hyperlipidemia is "a general term for elevated concentrations of any or all of the lipids in the plasma." *Dorland's Medical Dictionary*, http://www.dorlands.com (last visited Feb. 25, 2013).

[7] Plaintiff has also made reference to a hospitalization in October 2007, and claims to have side effects from two strokes. (*E.g.*, R. at 40-41). However, the medical records from that visit show that Plaintiff's primary reason for the visit was an abscess causing throat pain, which was treated. (R. at 358). It appears the evidence of Plaintiff having two strokes is the report from a head CT done near the end of his multiple-day hospital stay, noting a finding of "small old infarcts." (R. at 383). Otherwise there are no medical records concerning the strokes or any after effects. As Plaintiff does not allege the ALJ erred in not finding the strokes to be a basis for

On July 29, 2008, Plaintiff began seeing Dr. Devashish Agarwal. (R. at 271). Dr. Agarwal noted Plaintiff had coronary artery disease, hypertension, and hyperlipidemia, and that he was stable with no acute symptoms. (R. at 271). Plaintiff complained of side effects from his nitroglycerin, prescribed to treat his hypertension. (R. at 271). By Plaintiff's next visit to Dr. Agarwal, on September 15, 2008, he had stopped taking the nitroglycerin medication because of the side effects. (R. at 269). Dr. Agarwal noted "[Plaintiff] knows the risks of discontinuing medication abruptly but is not ready to start his nitroglycerin." (R. at 269).

The medical records first show complaints of neck pain during Plaintiff's October 27, 2008, visit to Dr. Agarwal. (R. at 267). His coronary artery disease was noted as stable. (R. at 267). Plaintiff's financial difficulties were stated as the reason he could not see a cardiologist. (R. at 267). Dr. Agarwal noted arthritic changes in past x-rays, prescribed Flexeril,[8] and instructed him on neck mobilizing exercises. (R. at 267). Plaintiff's December 8, 2008, visit produced similar notes. (R. at 344). The coronary artery disease was stable, and Dr. Agarwal noted no shortness of breath or chest pains. (R. at 344). In fact, Plaintiff ran to the clinic that day. (R. at 344). Dr. Agarwal made note of "neck and lower back pain with some paraspinal muscle spasm secondary to arthritis," but Dr. Agarwal also noted a lack of other symptoms, such as radiation, incontinence, or neuro deficits. (R. at 344). He suggested use of Flexeril and over-the-counter pain medication and a plan to get more x-rays. (R. at 344).

---

disability, the confusing matter of the past strokes can be disregarded as irrelevant for purposes of this judicial review.

[8] Flexeril is a "skeletal muscle relaxant for relief of painful muscle spasms." *Dorland's Medical Dictionary*, http://www.dorlands.com (last visited Feb. 25, 2013).

Two months later, on February 25, 2009, Plaintiff saw Dr. Wade Carlson, who assisted Plaintiff in filling out paperwork to apply for financial assistance for his prescription medication. (R. at 342). The only symptoms noted were neck pain and headache. (R. at 342). Dr. Carlson opined that if Plaintiff's coronary artery disease were under control, "he may be able to work." (R. at 342). He noted a past x-ray showing mild degenerative disease and stated that if the "neck pain continues to be bothersome" they would need to do further imaging. (R. at 342). He prescribed a medication used to treat arthritis. (R. at 342).

Plaintiff again returned to Dr. Agarwal on June 10, 2009. (R. at 343). Plaintiff's complaint at that visit was of severe headache, which Dr. Agarwal attributed to his uncontrolled hypertension. (R. at 343). Plaintiff had not taken his medication because he could not afford it. (R. at 343). Dr. Agarwal gave him an injection of Toradol[9] and samples of blood pressure medication. (R. at 343). He returned for more samples on July 1, 2009; Dr. Agarwal noted at that time that Plaintiff was compliant with his medication. (R. at 341). On that date and at the next visit on August 21, 2009, Plaintiff denied shortness of breath, chest pain, swelling in lower extremities, nausea, vomiting, and dizziness. (R. at 338, 341). There was no mention of neck and back pain at these three visits. (R. at 338, 341, 343).

On September 18, 2009, Plaintiff again complained of neck and back pain and reported his inability to afford medications. (R. at 337). Dr. Agarwal noted that Plaintiff brought in the medications he did have, and that Plaintiff had not been

---

[9] Toradol is a drug used for the "short-term management of pain." *Dorland's Medical Dictionary*, http://www.dorlands.com (last visited Feb. 25, 2013).

taking one of the medications used to treat hypertension. (R. at 337). Dr. Agarwal "counsel[ed Plaintiff] to be compliant with his medications." (R. at 337). He noted no acute symptoms related to coronary artery disease. (R. at 337). He also noted Plaintiff was using Tylenol to treat his neck and back pain, that there were no symptoms of radiculopathy, and that he taught Plaintiff back and neck strengthening exercises. (R. at 337).

On the same day as this visit, Dr. Agarwal filled out a form entitled "Multiple Impairment Questionnaire" at Plaintiff's attorney's request. (R. at 288-95). This eight-page form is sparsely filled out. (R. at 288-95). The diagnoses were listed as coronary artery disease, generalized osteoarthritis, and uncontrolled hypertension. (R. at 288). When asked for clinical findings to support the diagnoses, Dr. Agarwal noted no shortness of breath or chest pain, and otherwise only listed "aches [and] pains in neck [and] back." (R. at 288). The only primary symptoms listed were pain and fatigue. (R. at 289). However, Dr. Agarwal reported both pain and fatigue to be ten out of ten on a scale of severity. (R. at 290). He reported an ability to sit for only one hour per work day and stand or walk for only two hours. (R. at 290). The next two pages are blank, then the notes pick up again, with a report of constant symptoms that interfere with attention and concentration. (R. at 293). Dr. Agarwal also opined that emotional factors contributed to Plaintiff's symptoms and limitations, and that he is not a malingerer. (R. at 293). He opined that Plaintiff was incapable of even low stress work until the high blood pressure and pain got under control. (R. at 293). Dr. Agarwal also noted there could be good days and bad days. (R. at 294).

8

The record also contains three reports from agency consultant physicians. First, Dr. Michael Nenebar was asked whether Plaintiff's July 5, 2008, hospitalization would qualify for a three-month hold. (R. at 238). He responded it would not. (R. at 238). Second, Dr. Ernst Bone reported that Plaintiff failed to keep an appointment with an internist, resulting in his disability claim being denied for failure to cooperate. (R. at 259). Third, Dr. Towfig Arjmand gave the only substantive review of Plaintiff's medical records and found, on reconsideration of the denied disability claim, that Plaintiff's medical impairments were not severe. (R. at 284-86).

## II. Hearing Testimony

At the hearing on February 23, 2010, Plaintiff responded to questions from both the ALJ and his non-attorney representative. First, his representative explained to the ALJ that the basis for Plaintiff's disability claim was coronary artery disease, an April 2008 heart attack, a stroke in October 2007, and generalized osteoarthritis in his back. (R. at 33). The ALJ then questioned Plaintiff. Plaintiff testified that he lives in a house with his mother, stepfather, and daughter. (R. at 36). He testified to his past work experience, including that he had last worked on July 3, 2008. (R. at 37-39).

When asked about what he takes for pain, Plaintiff testified he "can only take Tylenol because they cut [him] off the medicine [he] used to get" because he doesn't have any income. (R. at 40). He takes four or five Tylenol per day. (R. at 40). After some discussion about Plaintiff's strokes, he testified that since then his blood pressure has been "sky high." (R. at 41). In reference to the heart attack, Plaintiff

9

testified that he still has chest pains and takes medication for it. (R. at 42). He testified that he still has nitroglycerin, but only takes it when it is severe; he then testified that he was taken off nitroglycerin and given something else. (R. at 42-43). When asked about the back pain, Plaintiff asserted that he has had back pain problems since the last day he worked and that he had pain before then but worked anyway because he had to pay the bills until he was no longer able to tolerate it. (R. at 43).

Plaintiff testified to his daily activities, stating that he does not do housework, yard work, shopping, or laundry, but prepares his meals and cares for his personal hygiene. (R. at 43-46). He plays cards with his daughter, but otherwise does not have hobbies and is not involved in social organizations. (R. at 44). He watches some television and sometimes reads. (R. at 45). Plaintiff testified he mostly spends his day around the house, often sleeping. (R. at 45). He testified that he quit smoking and does not use street drugs. (R. at 46).

Plaintiff's representative also questioned him. Plaintiff testified that he used to get chest pains when he was working, but now he only gets chest pains when he exerts himself too much, such as walking three blocks or going up stairs. (R. at 47). He climbs the stairs at his home and does not use a cane for walking. (R. at 47). If he does get chest pain from exertion, he relaxes by lying or sitting down. (R. at 47-48). Plaintiff testified he could not stand for an hour, and that if he stands he gets fatigued and his back starts to hurt. (R. at 48). He testified he can sit in a chair for only five or ten minutes without getting neck or back pain, then he has to lie down.

(R. at 49). Plaintiff also testified that he can lift only five pounds on a regular basis. (R. at 50-51).

Plaintiff described the pain in his lower back as throbbing, and that it moves up to his neck and sometimes down to his legs. (R. at 51). He described the pain in his neck as a stabbing pain, and his leg pain feels like numbness. (R. at 52). The ALJ then concluded the hearing without questioning the vocational expert who was present. (R. at 53).

## III. ALJ's Decision

The ALJ issued his decision on September 20, 2010, denying Plaintiff's claim for benefits. (R. at 15-22). The ALJ applied the five-step process required by 20 C.F.R. § 404.1520, as outlined above. (R. at 16-17). Applying the first step, the ALJ found Plaintiff had not engaged in substantial gainful activity since the date of alleged onset of disability, April 15, 2008. (R. at 17). The ALJ then determined that Plaintiff had the medically determinable impairments of coronary artery disease and degenerative changes in the spine, but that these impairments, even in combination, did not significantly limit the ability to perform basic work-related activities. (R. at 17-18). Thus, the ALJ found Plaintiff was not disabled at step two, so did not need to go further in the five-step analysis.

### DISCUSSION

Plaintiff seeks reversal of the ALJ's decision on two primary grounds. First, he argues the ALJ's decision is not supported by substantial evidence. Second, he argues the ALJ improperly rejected his statements and made an erroneous credibility determination.

## I. Substantial Evidence

Plaintiff argues that the ALJ erred in finding no severe impairments. He argues that step two is meant to screen out only slight abnormalities, but that the evidence in this case shows impairments more serious than that. (Doc. 8 at 5-9). He also argues that the ALJ erred by relying "entirely" on non-examining consultant opinions and improperly rejected the opinion of treating physician Dr. Agarwal. (Doc. 8 at 6-9).

### A. Support in the Record

The ALJ's decision must be supported by substantial evidence. Substantial evidence is "'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Maggard*, 167 F.3d at 379 (quoting *Richardson*, 402 U.S. at 401). As noted above, the burden is on the claimant at this step of the assessment. *McNeil*, 614 F.2d at 145. Plaintiff is correct that the claims that are generally denied at step two of the inquiry are those involving only "slight abnormalities" with "no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 61 Fed. Reg. 34468 (July 2, 1996). Basic work activities include mental and emotional functions as well as physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1521(b).

The Court has reviewed the record, and finds the ALJ's decision is supported by substantial evidence. As to Plaintiff's coronary artery disease, the record demonstrates that his condition is stable and does not limit Plaintiff's activities. The ALJ discussed the notes from Plaintiff's visits to Dr. Agarwal, pointing out that

there were no acute symptoms related to coronary artery disease noted any time after Plaintiff's hospitalization in July 2008 and that Dr. Agarwal repeatedly noted his condition as stable. (R. at 19). He twice noted Dr. Agarwal's report that Plaintiff ran to the clinic for an appointment in 2008. (R. at 19, 20). As to the back and neck pain, which Dr. Agarwal attributes to osteoarthritis, the ALJ correctly pointed out that his range of motion was normal, there was no loss of muscle strength or tone, and there was no evidence of radiculopathy or other symptoms of a disabling spinal column disorder. (R. at 19). The ALJ notes that the degenerative changes in Plaintiff's spine are mild, as supported by the record. (R. at 18, 21). As discussed further below, the ALJ properly determined that Plaintiff's complaints of pain were not credible. He details at length the lack of symptoms exhibited by Plaintiff and the need for only conservative care to treat those symptoms he does have. (R. at 19-21). Thus, substantial evidence supports the ALJ's finding that Plaintiff's impairments have no more than a minimal effect on his ability to perform basic work functions.

Overlapping somewhat with the treating source rule discussion below, Plaintiff contends that the ALJ "rel[ied] entirely on the opinions from the non-examining medical consultants," and that this cannot satisfy the substantial evidence standard. (Doc. 8 at 7). This argument is plainly without merit. The ALJ based his decision in large part on the treatment records from Dr. Agarwal, Plaintiff's treating physician. (*See* R. at 19-21). As noted above, evidence such as the lack of acute symptoms, ability to run to his appointment, and the stability of Plaintiff's coronary artery disease all came from Dr. Agarwal's notes. The ALJ only

made reference to the opinions of the agency reviewing physicians twice: first in his summary of the medical evidence, (R. at 19), then again in one brief sentence in a paragraph containing a number of reasons for rejecting the claims of disabling symptoms (R. at 21). The vast majority of medical evidence cited by the ALJ came from Dr. Agarwal's records. The ALJ clearly did not rely entirely on non-examining medical opinions and in fact gave their opinions comparatively little consideration. Simply because he reached the same conclusion does not mean he relied on their opinions. Thus, this argument fails.

*B. Treating Source Rule*

Further, the ALJ did not, as Plaintiff alleges, improperly reject treating physician Dr. Agarwal's opinion. Under the treating source rule, as it is commonly called, if "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record, [it will be given] controlling weight." 20 C.F.R. § 404.1527(c)(2). The Seventh Circuit explains this rule as a presumption of the "bursting bubble" variety—once opposing evidence is introduced, the presumption of controlling weight disappears. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). If contradicting evidence results in a conclusion that the opinion is not entitled to controlling weight, the ALJ must then determine how much weight to give the opinion using the various factors listed in the regulations. *E.g., id.*

An ALJ must give good reasons in his decision for not giving controlling weight to a treating source. *E.g., Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir.

2010). Rejecting an opinion simply because it was requested by the claimant or his attorney is not a good reason. *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). Noting inconsistencies that are factually incorrect or "cherry picking" a single note that purportedly undermines the opinion are also not good reasons for rejecting a treating source's opinion. *Id.* at 710; *Campbell*, 627 F.3d at 306-08. However, internal inconsistencies provide good reason to not give an opinion controlling weight. *E.g.*, *Clifford*, 227 F.3d at 871. An ALJ may also discount a treating physician's opinion where it is inconsistent with a consulting physician's opinion, or is based solely on the subjective complaints of the claimant. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

Dr. Agarwal was Plaintiff's primary care physician, and began seeing Plaintiff shortly after his hospitalization in July 2008. (R. at 271). The only opinions of Dr. Agarwal's to which the ALJ did not give controlling weight appears to be those contained in the Multiple Impairment Questionnaire filled out at Plaintiff's representative's request. Other than that, Dr. Agarwal's treatment notes and opinions are relied upon heavily by the ALJ, as nearly the only source of information about Plaintiff's medical condition after his hospitalizations in October 2007 and July 2008. (*See* R. at 19-21). With respect to this questionnaire, however, the ALJ determined that Dr. Agarwal's assessment of Plaintiff's ability to perform work activities "is not supported by objective medical evidence and is not afforded significant probative value." (R. at 20).

Unlike the agency decisions in the cases cited by Plaintiff, the ALJ in this case explained his reasoning for rejecting Dr. Agarwal's assessment of Plaintiff's

work abilities at length. The ALJ noted numerous inconsistencies between the form and Dr. Agarwal's own diagnoses, treatments, and records. He points out that despite Dr. Agarwal's affirmation in the form that Plaintiff's emotional factors interfere with his work abilities, there is no mention of emotional or mental impairments in any of Dr. Agarwal's treatment notes or records. (R. at 20). The ALJ also explained that the form was not completed, and that Dr. Agarwal referred back to his treatment notes instead. (R. at 20). These treatment notes do not support a conclusion of severe and constant pain and fatigue. Plaintiff's back and neck pain was treated primarily with over-the-counter pain medication, yet Dr. Agarwal stated in the form that he had not been able to relieve the pain with medication without side effects. (R. at 20). The ALJ notes nothing in Dr. Agarwal's treatment notes to support severe limitations in Plaintiff's ability to stand and sit. (R. at 20). The ALJ also concluded that Dr. Agarwal is "sympathetic to the needs of his patient and is attempting to help his patient obtain benefits." (R. at 20). He found that Dr. Agarwal "accepted, without support" Plaintiff's allegations of severe pain. (R. at 20).

These reasons given by the ALJ provide ample support for his rejection of Dr. Agarwal's statements regarding Plaintiff's limitations in the questionnaire. There were multiple inconsistencies with Dr. Agarwal's other notes and contradictory evidence in the record, particularly a lack of any indication of this level of severity anywhere else in the record. Further, reliance upon subjective complaints is a good reason for giving less weight to a medical opinion. *See Ketelboeter*, 550 F.3d at 625. The ALJ's conclusion that Dr. Agarwal was sympathetic to the patient was not erroneous, and was not, as Plaintiff contends, speculation. The ALJ explained his

reasoning for this conclusion, and this appears to be one of those cases in which the treating doctor was "bend[ing] over backwards to assist a patient in obtaining benefits." *Hofslien*, 439 F.3d at 377. The ALJ found the opinion was not well-supported by objective evidence and was inconsistent with the rest of the record, including Dr. Agarwal's own observations, and thus was not entitled to controlling weight under 20 C.F.R. § 416.927(c)(2).

If a treating source's opinion is not given controlling weight, the ALJ is to apply the factors in 20 C.F.R. § 404.1527(c) to determine what weight it is given. The factors include the length, nature, and extent of the treatment relationship, supporting evidence, consistency, and specialization of the physician. *See* 20 C.F.R. § 404.1527(c). The reasons "must be sufficiently specific to make clear to any subsequent reviewers the weight" given to the treating source's opinion. SSR 96-2p, 61 Fed. Reg. 34490 (July 2, 1996). Plaintiff cites no cases requiring the ALJ to articulate and apply each factor in a particular format. In fact, courts have rejected such superficial, mechanical requirements. *See, e.g.*, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Brown v. Barnhart*, 298 F. Supp. 2d 773, 792 (E.D. Wis. 2004); *McCormick v. Astrue*, No. 11-cv-328, 2012 WL 1886508 (N.D. Ind. May 23, 2012).

In this case, the ALJ concluded that Dr. Agarwal's opinion in the Multiple Impairment Questionnaire was "not afforded significant probative value," and explained his reasoning, but did not specifically list and apply the factors one-by-one in the opinion when explaining that determination. (R. at 20). Instead, in one comprehensive paragraph, the ALJ adequately explained the reasons he did not

give Dr. Mullin's opinion controlling weight, as described above, and that he instead gave it very little weight. The fact that the reasons overlapped is not problematic. Many of the reasons he gave coincide with the factors listed in 20 C.F.R. § 404.1527(c), showing he properly considered them. The explanation was specific enough for the Court to clearly understand the weight the ALJ gave to Dr. Agarwal's opinion. Therefore, the decision will not be reversed on this ground.

## II. ALJ's Credibility Determination

Plaintiff also challenges the ALJ's determination that his testimony about his symptoms was not credible. (Doc. 8 at 9-12). He argues that the ALJ did not adequately explain the credibility determination and that the reasons given were insufficient to support a finding that his testimony was not credible. (Doc. 8 at 9-12). He argues the ALJ inappropriately failed to consider reasons for Plaintiff's conservative treatment, and that the ALJ improperly relied on Plaintiff's ability to engage in a range of daily activities to reject Plaintiff's credibility. (Doc. 8 at 10).

Defendant, in supporting the ALJ's credibility determination, focuses in part on Plaintiff's non-compliance with his prescribed treatment and the inconsistencies between Plaintiff's reports of marijuana use. (Doc. 10 at 9-12). However, as Plaintiff correctly points out in its Reply, the ALJ makes no mention of these potential reasons for rejecting Plaintiff's credibility in his opinion. Thus, it is a post hoc rationalization, prohibited by the Commissioner on review of an ALJ decision in the district court. *See Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). However, Defendant also correctly points to other support the ALJ gave for his credibility

determination. As explained below, the ALJ's credibility determination is not patently wrong and therefore will not be disturbed.

The credibility determinations of an ALJ are entitled to "considerable deference." *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993). These conclusions are not upset "so long as they find some support in the record and are not patently wrong." *Herron*, 19 F.3d at 335. However, the ALJ is required to explain the reasons for his credibility finding. *E.g.*, *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003). In addition to the medical evidence, the ALJ also must consider the factors for evaluating symptoms set forth in 20 C.F.R. § 404.1529(c). *See id.* Those factors include daily activities, descriptions of pain and what causes it, medication, treatment, and measures to relieve symptoms. 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ provided an ample explanation of the reasons he found Plaintiff's testimony non-credible. He described the medical history and symptoms, then discussed the reasons the ALJ found that Plaintiff's complaints were not credible. In reviewing the record, he determined that although Plaintiff may have had symptoms related to his conditions, the asserted severity of those symptoms was not credible. The record certainly does not show this determination was patently wrong, and provides support for the ALJ's conclusion. The ALJ's opinion also shows that he considered the factors listed in the regulations, even if he did not explicitly list them in the opinion. He discussed Plaintiff's activities, medication, treatment, and measures to reduce pain. (R. at 20-21). Simply because the evidence could have resulted in a different conclusion does not make the credibility determination erroneous. *See Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

Plaintiff argues that the ALJ improperly gave weight to the fact that Plaintiff received only conservative treatment because the ALJ did not discuss Plaintiff's inability to afford certain treatments. (Doc. 8 at 11). If a claimant's explanations for failure to pursue treatment are taken into account, such failure can be used as a reason to disbelieve the claimant's testimony about his symptoms. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). As Plaintiff argued in a different portion of his brief, the ALJ must consider the treatment in weighing credibility. 20 C.F.R. § 404.1529(c)(3)(v). Here, the ALJ did not fault Plaintiff for failure to pursue treatment; instead, he emphasized that Plaintiff only conservative treatment was given or even recommended, thus indicating his symptoms were not as severe as he claimed. (R. at 19-21). The ALJ's observation that Plaintiff's conditions required only conservative care is not erroneous, as it is strongly supported by the record. The coronary artery disease required virtually no care beyond the medication Plaintiff used, and the disease was continually reported as stable and showing no acute symptoms. (*E.g.*, R. at 267, 341, 344).

As for the neck and back pain, Plaintiff also only received conservative care and treatment. Dr. Agarwal provided exercises and encouraged further use of over-the-counter pain medication, and suggested that if the pain continued they would eventually do imaging to investigate further. (R. at 267, 337). Dr. Carlson had similar recommendations, referring to Plaintiff's neck pain as "bothersome." (R. at 342). Plaintiff was only occasionally provided or prescribed pain medication, used to treat muscle spasms. (*See* R. at 267). In contrast, when Plaintiff came in complaining of severe headaches, he was given a Toradol injection to ease the pain;

no mention of back or neck pain was made at this appointment. (R. at 343). Thus, the ALJ properly concluded that Plaintiff's conservative treatment contradicted his assertions of severe and disabling symptoms, and properly considered that factor in making his credibility determination.

Plaintiff also argues that the ALJ erred in finding Plaintiff's daily activities inconsistent with disability. "[M]inimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity." *Clifford*, 227 F.3d at 872. Additionally, "[a]n ALJ cannot disregard a claimant's limitations in performing household activities." *Moss*, 555 F.3d at 562. However, where the ALJ does not exaggerate Plaintiff's testimony and considers the limiting qualifications, the factual determination is not improper simply because an alternative conclusion could have been reached. *Jones*, 623 F.3d at 1162.

Plaintiff argues the ALJ did not "specifically indicate what activities he believed were inconsistent with working full time." (Doc. 8 at 11). He further argues that his daily activities were in fact severely limited. (Doc. 8 at 11). Here, the ALJ accurately summarized the daily activities Plaintiff engages in, such as playing card games, watching television, and occasionally reading. (R. at 20-21). The ALJ also noted the limitation that Plaintiff does not do household tasks but attends to his personal needs. (R. at 21). As Plaintiff acknowledges in his brief, he is able to prepare his own meals. (R. at 43). The daily activities were used to explain the ALJ's finding that Plaintiff's reports of symptoms were not credible, because Plaintiff is able to engage in activities when he chooses to, even if they involve sitting, standing, or walking. (R. at 21). Because the ALJ considered Plaintiff's

limitations, and his credibility determination is supported by the evidence explained in the decision, it was not erroneous.

Even if the reasons of a range of daily activities and pursuing and receiving only conservative treatment were insufficient alone to justify ALJ's credibility determination, the ALJ gives other reasons as well for finding Plaintiff's statements non-credible. Simply because they were not in the paragraphs devoted to explaining the credibility determination does not mean these reasons were not relevant. The ALJ's opinion is given "a commonsensical reading." *E.g.*, *Rice*, 384 F.3d at 369 (internal quotation marks omitted). For example, the ALJ twice stated that Plaintiff ran to a doctor appointment with Dr. Agarwal. (R. at 19, 20). This clearly contradicts Plaintiff's assertions of severe limitations on the ability to walk even short distances. Thus, the ALJ's credibility determination was not patently wrong, and will be upheld.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision denying disability benefits is affirmed. IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 7) is denied, and Defendant's Motion for Summary Affirmance (Doc. 9) is granted.

CASE TERMINATED.


Entered this 28th day of February, 2013.


s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge
